DISCIPLINARY COUNSEL *v.* DUNDON.

[Cite as *Disciplinary Counsel v. Dundon,*

129 Ohio St.3d 571, 2011-Ohio-4199.]

*Attorneys—Misconduct—Neglect of entrusted legal matter—Failure to promptly deliver funds owed to client—Failure to act with reasonable diligence—Failure to reasonably consult with client—Failure to keep client reasonably informed—Failure to respond to client requests for information with reasonable promptness—Public reprimand.*

(No. 2011-0339—Submitted April 19, 2011—Decided August 30, 2011.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 10-067.

_____

**Per Curiam.**

{¶ 1} Respondent, Jeffrey Raymond Dundon, Attorney Registration No. 0034271, was admitted to the practice of law in Ohio in 1985. On August 16, 2010, relator, Disciplinary Counsel, filed a complaint charging respondent with violations of the Code of Professional Responsibility and the Rules of Professional Conduct pertaining to his representation of Caroline Zell. On September 9, 2010, Dundon filed an answer denying the alleged violations. However, on January 5, 2011, the parties filed stipulations in which respondent admitted certain violations and respondent and relator proposed a six-month stayed suspension as the appropriate sanction. On January 12, 2011, the case was heard before a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio. The board recommends the less severe sanction of a public reprimand. We agree with this sanction.

**Misconduct**

**{¶ 2}** In 2006, respondent was a partner in the firm of Dundon & Huddleston. Respondent maintained an office in Centerville, while his partner, Larry Huddleston, kept an office in Columbus. In November 2006, respondent met with Caroline Zell to discuss estate-planning issues. Zell hired respondent to develop an estate plan that included creating limited-liability companies ("LLCs") to protect Zell's rental properties. Zell signed an agreement to pay respondent $10,000 for the estate-planning work, with a $5,000 retainer. On December 9, 2006, Zell sent respondent a check for the $5,000 retainer.

**{¶ 3}** On December 28, 2006, respondent's paralegal forwarded to Zell forms regarding the organization and registration of three LLCs that required Zell's signature. Zell executed and returned those forms to respondent. On January 11, 2007, respondent's paralegal forwarded the forms to the secretary of state for filing. On January 23, 2007, the secretary of state's office approved the three LLCs and returned to respondent copies that documented the registration of these three LLCs.

**{¶ 4}** On January 30, 2007, respondent met with Zell, Jim Hayslip (Zell's financial advisor), and Jeff Zell (Zell's son). The purpose of the meeting was for Zell to sign various documents that respondent had prepared, including an irrevocable life-insurance trust, an Ohio healthcare power of attorney, an Ohio living-will declaration, a will, a trustee's affidavit, an assignment of personal property, a power of attorney, an Ohio Insurance Portability and Accountability Act declaration, and a living trust.

**{¶ 5}** The next day, respondent's paralegal forwarded the originals of all these documents (the "trust book") to Jerel Noggle at MainSource Bank, requesting that he sign where indicated and return the documents to respondent. MainSource was to act as trustee for the irrevocable trust. However, Noggle never returned the trust book to respondent, and respondent never followed up with him about the trust book.

**{¶ 6}** In January 2007, respondent sent a letter to each of his ten active clients explaining that he would soon be leaving the practice of law, and their files could be turned over to his partner, Larry Huddleston, in Columbus. Respondent also provided these clients a list of other local attorneys who would be willing to take their cases.

**{¶ 7}** On February 5, 2007, respondent's paralegal forwarded to Zell the three LLC certificates that had been approved by the secretary of state. Three days later, respondent's paralegal forwarded to Zell organization and registration forms for three additional LLCs that required Zell's signature. Zell executed and returned those documents to respondent. On February 15, 2007, respondent's paralegal forwarded those documents to the secretary of state for filing.

**{¶ 8}** On February 21, 2007, Zell sent respondent the balance of his fee ($5,000).

**{¶ 9}** At the end of February 2007, respondent closed his law office in Centerville and went to work for the University of Cincinnati as the director of planned giving. After respondent's office was closed, phone calls to his office were forwarded to Huddleston's office in Columbus.

**{¶ 10}** The secretary of state's office approved Zell's last three LLCs on February 22, 2007, and mailed copies of these documents to respondent on March 1, 2007.

**{¶ 11}** On June 14, 2007, Loretta Jamieson from Huddleston's office sent an e-mail to respondent stating that Jim Hayslip had called to say that Zell was unhappy because she had not received any follow-up regarding the status of her LLCs since she had paid the balance of her fee to respondent in February. Two days later, respondent sent an e-mail to Hayslip that stated:

**{¶ 12}** "I have Caroline Zell's file, but I have not received the executed life insurance trust back from the bank. I will follow up on Monday with the trust officer.

**{¶ 13}** "The last of the LLC certificates came last week, so we need to transfer the property [to] the individual LLCs. Jim do you have the property descriptions?"

**{¶ 14}** Respondent could not explain why it took so long for the certificates to reach him when, according to the secretary of state's records, they were mailed to him on March 1, 2007.

**{¶ 15}** On September 20, 2007, Jamieson sent respondent another e-mail indicating that Jeff Zell and Hayslip were furious because respondent had still not followed up with them. Jamieson requested a copy of Zell's file. The next day, respondent e-mailed Jamieson that he had told Caroline Zell's manager that all the LLCs had been formed and that several months ago, he had twice requested either Zell or Hayslip to provide the deeds needed to transfer the real property into the LLCs , but had not yet received a response.

**{¶ 16}** On February 12, 2008, Jeff Zell wrote to respondent complaining about the delay in completing his mother's estate plan. He further stated that he had met with Larry Huddleston about his mother's living trust and that the meeting had cost him $300. Jeff asserted that he should not have had to pay, because the work was respondent's responsibility. Finally, the letter requested that respondent complete all the work by March 1, 2008, and that respondent send all notes and files to Larry Huddleston. Shortly thereafter, respondent sent Jeff Zell a check for $300.

**{¶ 17}** On March 18, 2008, Jamieson sent respondent an e-mail stating that Jeff Zell had just called her, and he was angry that he had received no response to his February 12 letter. Respondent replied that he would send Zell's file to Huddleston the following week.

**{¶ 18}** On April 8, 2008, Jamieson e-mailed respondent, asking him if he had sent Zell's file yet. Respondent replied that he sent the file the night before.

However, two days later, respondent informed Jamieson that Zell's file had been returned because he put the wrong zip code on the box. He promised to resend it.

{¶ 19} On February 6, 2009, attorney Ralph Russo wrote a letter to respondent indicating that Zell had hired his firm to represent her regarding the creation of her estate plan. Russo demanded that respondent return Zell's $10,000 fee. Respondent did not reply to the letter and did not return the fee at that time.

{¶ 20} Beginning in February 2007, during his communications with Jamieson, Jeff Zell, and Ralph Russo regarding Zell's file, respondent believed that he had transferred copies of Zell's estate-planning documents to Huddleston in electronic format. In fact, Huddleston never received these documents.

{¶ 21} Respondent learned from relator that Ralph Russo had drafted an entirely new set of estate-planning documents for Zell. Consequently, respondent refunded Zell's entire $10,000 fee in January 2011.

{¶ 22} Because respondent failed to regularly communicate with Zell, failed to follow up on the status of the trust documents with MainSource Bank, and failed to timely respond to Zell's new attorney's request for a refund of fees, the parties stipulated and the panel and board found by clear and convincing evidence that respondent had violated DR 6-101(A)(3) (a lawyer shall not neglect a legal matter entrusted to him) and 9-102(B)(4) (a lawyer shall promptly pay or deliver to the client all funds in which the client is entitled), and Prof.Cond.R. 1.3 (a lawyer shall act with reasonable diligence and promptness in representing a client), 1.4(a)(2) (a lawyer shall reasonably consult with a client), 1.4(a)(3) (a lawyer shall keep a client reasonably informed), and 1.4(a)(4) (a lawyer shall comply as soon as practicable with reasonable requests for information from the client).

### Sanction

{¶ 23} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the

sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10(B) of the Rules and Regulations Governing Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21; *Akron Bar Assn. v. Freedman*, 128 Ohio St.3d 497, 2011-Ohio-1959, 946 N.E.2d 753, ¶ 7.

**{¶ 24}** The parties stipulated and the panel and board found that none of the aggravating factors in BCGD Proc.Reg. 10(B)(1) were present. As mitigating factors under BCGD Proc.Reg. 10(B)(2), the parties stipulated and the panel and board also found that respondent had no disciplinary record, had not acted with a dishonest or selfish motive, had acknowledged his wrongful conduct, had cooperated during the disciplinary process, and had made full restitution to his client.

**{¶ 25}** Relator and respondent recommended that the appropriate sanction is a six-month stayed suspension. Relator cited three cases in support of this sanction: *Dayton Bar Assn. v. Sebree,* 96 Ohio St.3d 50, 2002-Ohio-2987, 770 N.E.2d 1009, *Disciplinary Counsel v. Harp* (2001), 91 Ohio St.3d 385, 745 N.E.2d 1032, and *Cincinnati Bar Assn. v. Wilson* (2000), 89 Ohio St.3d 243, 730 N.E.2d 957.

**{¶ 26}** In *Sebree,* in addition to other violations, the attorney failed to respond to a counterclaim filed against one client and failed to prosecute a collection case for another client. *Sebree* at ¶ 2, 3. The court found that the attorney had neglected an entrusted legal matter, failed to seek the lawful objectives of a client, and failed to carry out a contract for professional services. Id. at ¶ 5, 8. The court imposed a six-month suspension of his license, stayed on conditions. Id at ¶ 9.

**{¶ 27}** In addition to other violations, the attorney in *Harp* had caused the dismissal of a client's case by failing to respond to a motion to dismiss, failing to file a complaint on behalf of another as promised, and completely failing to take any action on behalf of two others. Id., 91 Ohio St.3d 385, 745 N.E.2d 1032. The court found that the attorney neglected an entrusted legal matter, failed to seek the lawful objectives of a client, and failed to carry out a contract for professional services. The court imposed a stayed six-month suspension of his license, with conditions. Id. at 386.

**{¶ 28}** In addition to other misconduct, the attorney in *Wilson* failed to inform a client that the defendant had offered to settle the case and then failed to respond to a motion for summary judgment, which resulted in the dismissal of the case with prejudice. *Wilson*, 89 Ohio St.3d 243, 730 N.E.2d 957. The court found that the attorney had neglected an entrusted legal matter, failed to seek the legal objectives of a client, failed to carry out a contract of employment, and prejudiced or damaged a client during the course of a professional relationship. The court imposed a six-month suspension, stayed upon conditions, including the assignment of a monitor and the payment of restitution.

**{¶ 29}** The panel herein believed that the conduct in these cases was more egregious than respondent's conduct. Specifically, the panel recognized that the respondent had actually prepared the documents necessary to complete Zell's estate plan, but that his failure to pay attention to the circumstances that subsequently arose resulted in his failure to fulfill the obligation to his client. The panel further found that respondent's actions in this case appeared to be an aberration. Finally, the panel found that there seemed to be little risk of repetition or a danger to the public in this case. Consequently, the panel recommended that respondent be given a public reprimand and that he pay the costs of the proceedings.

**{¶ 30}** The board adopted the panel's findings of fact and conclusions of law and recommended that we publicly reprimand respondent and charge him with costs. We adopt the board's findings of fact and conclusions of law and the board's recommended sanction. Consequently, respondent is hereby publicly reprimanded.

**{¶ 31}** Costs taxed to respondent.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Carol A. Costa, Assistant Disciplinary Counsel, for relator.

Montgomery, Rennie & Johnson and George D. Jonson, for respondent.

_____